GARY W. et al.

v.

STATE OF LOUISIANA et al.

Civ. A. No. 74–2412.

United States District Court,
E. D. Louisiana.

July 26, 1976.

Supplemental Reasons for Court's
Order Oct. 28, 1976.

Order with Respect to Children in Texas
Institutions Dec. 2, 1976.

See also, D.C., 429 F.Supp. 711.

William E. Rittenberg, New Orleans, La., Steve Berzon, Daniel Yohalem, Washington, D. C., for plaintiffs.

Susan G. Daniel, Geneviene Holm, Thomas R. Sheran, Louis M. Thrasher, Washington, D. C., for intervenor.

Robert Funderburk, Jr., Baton Rouge, La., James P. Dore, Plaquemine, La., Chester E. Darnell, Houston, Tex., J. Carlisle DeHay, Jr., Dallas, Tex., Ronald K. Gurley, Louis M. Jones, New Orleans, La., Clarence F. Kendall, II, Houston, Tex., John Rienstra, Beaumont, Tex., James P. Screen, New Orleans, La., James J. Thornton, Jr., Shreveport, La., Cynthia Anne Wegmann, John D. Wogan, New Orleans, La., for defendants.

ALVIN B. RUBIN, District Judge.

This class action comprises as plaintiffs all mentally retarded, emotionally dis-

turbed, and other children from Louisiana who have been placed in Texas institutions either by direct action of the State of Louisiana or with financial support from the state. The plaintiffs contend that conditions in the Texas institutions violate their constitutional rights, that they have not been accorded the treatment due them under the constitution and applicable federal statutes, and, further, that the mere fact of their placement in out-of-state facilities is itself a denial of adequate treatment and therefore violates their federal statutory and constitutional rights. The plaintiffs seek their return to Louisiana and basic changes in their treatment.

The case reached trial after two years of intensive preparation. Over 47,000 pages of exhibits were introduced or referred to: over 3300 pages of testimonial depositions were introduced; and the trial occupied eleven days. The testimony of eighteen expert witnesses and sixteen fact witnesses was taken. Eighteen lawyers participated in the trial. Voluminous briefs have been filed, before and after the trial. After this annealment, there is serious dispute about only a few factual issues; however, there remains basic controversy regarding the medical, psychological and psychiatric theories that should govern state action and the constitutional and statutory issues.

## I. THE CHILDREN AND THE INSTITUTIONS

The children who are plaintiffs have widely differing characteristics. Some are normal children who have been abandoned by their parents; some are normally intelligent but socially delinquent; some are emotionally disturbed; some are mentally retarded; and some are physically handicapped in varying degrees. Many of the children suffer from a combination of afflictions; for example a single child may suffer from physical disability, emotional disturbance and mental retardation. Some children in their teens are hydrocephalic, have never been toilet trained, are unable

to walk and have IQ's under 20. The characteristics all the plaintiffs share are that all are children from Louisiana; all are in Texas institutions; and the State of Louisiana has played some part in their placement.

Louisiana has two state agencies that carry out its policies in the matters involved in this suit. Both are in the Louisiana Health and Human Resources Administration (LHHRA). One is the Division of Family Services (DFS), which has the temporary custody of children who have been abandoned, adjudged neglected or delinquent by juvenile courts, surrendered into DFS custody, or whose parents have contracted for services with the DFS.[1] The second is called the Exceptional Children's Act Program (ECA); ECA provides funds to pay wholly for, or to assist parents in paying for, the care of children placed in institutions. Some of the children in the ECA program are placed pursuant to the order of a Louisiana state court; most are placed by their parents with financial assistance and various degrees of guidance from ECA. In many instances, parents find it no longer possible to care for these unfortunate children in their own homes because of the emotional, physical and financial demands of home care and the stress placed on other children by the presence of a disturbed or handicapped child in the home. Beset with these problems and their own emotional interactions, they implore state authorities for assistance.

Louisiana has several institutions and a number of other facilities designed to care for children under DFS and ECA programs. Some children are placed in Louisiana State institutions designed to care for mentally retarded or emotionally disturbed persons; some are placed in foster homes; some are placed in non-profit eleemosynary facilities operated by philanthropic or religious organizations; some remain at home and receive special out-patient care or education. But all the Louisiana facilities, public and private, together do not presently have

1. In 1975, 4701 children were in DFS custody: 4296 (91%) had been adjudged dependent or neglected by Louisiana Courts; 232 (5%) were abandoned or surrendered to DFS; and 173 (4%) had been placed in DFS custody by contract with their parents. In 1975, 181 DFS children were in Texas institutions.

enough space to care for all the Louisiana children who are considered by state authorities or by the children's parents to need residence elsewhere than in their family homes. Each of the state institutions has a long waiting list. The plaintiffs contend that placement of any child in an institution except as a temporary expedient deprives him per se of his federal constitutional and statutory rights. Pretermitting this, if the present program of institutional care were to be expanded to provide facilities for all Louisiana children whom their parents or state agencies deem in need of institutional care, the state would need three years or more to construct the required buildings in addition to a substantial amount of money for capital outlay. Therefore, for many years, DFS and ECA children have been placed in out-of-state institutions, a number of them in facilities located in Texas.

Children placed in Texas institutions are permitted to return home for visits at Christmas and during the summer school vacation period. Because of their own major physical and other problems, some children never return home for such visits. Others have no real home to return to. Even in cases where the child has parents interested in his welfare, it is difficult for the parent to visit the child at other times. Most of the institutions are a considerable distance from their homes. Working parents may lack funds and time to make visits. ECA has no funds to pay for parental visits. Nor are the children placed in Texas institutions visited by their case workers. The Texas institutions are licensed by the State of Texas; Louisiana authorities make no regular physical visits to or inspections of Texas institutions.[2]

There is much closer contact between LHHRA and the facilities in Louisiana. It has full licensing reports and studies on each institution. Many of its case workers and institutional counselors have visited these institutions, and none of the children

are placed without a preplacement interview of the child and his family.

In February, 1976, a total of 1869 children were placed by the ECA program. 1373 were located in Louisiana. 275 were in Texas. 221 were in other states. This is considerably less than the total placed in Texas in prior years, 326 in April 1975, 354 in April 1974, and 402 in April 1973. But the total number of children placed in institutions in states other than Texas and Louisiana has increased. Thus, while the number of children placed in Texas has been reduced, the number placed in other states has increased by approximately the same amount, and the total number of Louisiana children placed out of the state has remained constant. Meanwhile the total number of children in the program has increased; it has almost doubled since April 1973, and the number placed in Louisiana facilities has risen in the same period from 497 to 1373.

In 1975, DFS placed 181 children in Texas institutions; 11 children in institutions in other states; and 523 in Louisiana facilities.

## II. CONSTITUTIONAL AND STATUTORY ISSUES RELATIVE TO CHILD PLACEMENT

### A. The Parties' Positions

The "DFS children" and the "ECA children" placed pursuant to a court order are obviously in state custody. The state contends that a majority of the ECA children are placed voluntarily by their parents. The United States, which has become a plaintiff-intervenor, contends with the plaintiffs that the action of these parents is only nominally voluntary: the parents do not have access to Louisiana institutions; they are beset by personal and financial problems as a result of having an unusual child in their homes; they are not able adequately to care for and treat the children in their homes; the state provides financial aid to them, and usually supplies the only information the parents have

2. Some of the children involved are from Orleans Parish and are placed as a result of action by the Orleans Parish Department of Proba-

tion. It relies entirely on ECA and DFS to provide it with information and guide its decisions.

about available facilities;[3] and, in some instances, juvenile courts have required they make such placements or risk the loss of custody of their children through a juvenile court proceeding. The children have no opportunity to object to being placed in an institution, either in Texas or Louisiana. Therefore, plaintiffs and the United States both assert, the children are in fact placed in Texas by the state not by their parents acting of their own free will.

Standing on the premise that all of the children are in state custody, and hence have like rights, plaintiffs and plaintiff-intervenors urge that the state must provide each child with treatment. The primary objective of institutional treatment must be the reintegration of the children into their families and home communities. If a child has no biological family or lacks one willing to receive him, the state is required to provide a substitute family. Unless this family, natural or of the heart, is involved in the treatment and life of the child, it is impossible or at best difficult for the child to be reintegrated into home and community.

The family of a child placed in residential treatment in Louisiana has the opportunity to participate in the child's treatment program and life by visiting the child and having the child make day or overnight visits home. Even so, the plaintiffs argue, institutional treatment is undesirable. When institutional care is required, it should be afforded near the parents' home; its goal must be return of the child to the home; and the placement of the child must be in accordance with the inexorable application of "least restrictive alternative": that is, the kind of treatment that is both nearest the home and imposes the least of all possible restrictions on the child's freedom.

Therefore the plaintiffs call upon the state to provide a program based on the "least restrictive alternative." The first effort should be to rehabilitate the home environment, by providing psychological and financial assistance to parents to help them resolve their domestic and personal problems, cope with their emotional conflicts, and welcome and care for the child. To the extent necessary, day care institutions should be provided, offering as much therapy and education as the child requires or can assimilate. These day care centers would also provide daily relief for the children's families. If a child does require residential care elsewhere than the home, the state should attempt to provide it first in a foster home and accord that foster home the supportive services that may be needed to enable it to supply proper care for the child; if a foster home is not successful, residential care in a group home, that is, a homelike environment for a relatively small number of children, is to be provided as close to the parents' home as possible. When these are not successful or feasible, and institutional care is needed, it must be offered in an institution in Louisiana and close to the parental home. These theses were set forth by many well qualified experts; they are supported by most current literature relating to mentally retarded and emotionally disturbed children.

Although all of the experts who testified agree that this kind of program would be desirable for most of the children involved, a number of the experts called by the defendants disagreed with some aspects of it. Some of the state's expert witnesses believed that some children require institutional care either temporarily or for their entire lives; they thought that, for these children, institutional care is therapeutically beneficial. They thus disagreed with the thesis that institutionalization is per se baneful. They testified that some children suffer no harmful effect by residing a long distance from their parents; thus they differed with the proposition that therapy must be offered near the child's home. Some of the children are so profoundly retarded or handicapped that they can never be expected to return home. But even these experts agree that many, likely most,

---

**3.** ECA does make placement arrangements. Many parents do not have personal knowledge of available facilities, or sufficient resources to make pre-placement visits to investigate distant institutions, and ECA frequently advises parents that a certain Texas facility, named by ECA, is the only ECA placement available for their child.

of the plaintiffs could benefit to some degree by the kind of program sought by their counsel.

The postulate on which relief is initially sought is that sending any Louisiana child to any Texas institution violates rights guaranteed to that child by the Fourteenth Amendment and the Social Security Act. The case raises many other issues and this initial focus on one of them is not intended to be simplistic, but the single issue thus framed lies at the heart of the suit and should be considered at the outset.

**B.** *The Right to Care and Treatment*

■ Involuntary institutional confinement of any person, adult or child, entails a "massive curtailment of liberty," *Humphrey v. Cady*, 1972, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394. Such institutionalization stigmatizes those confined and may at times exceed even criminal incarceration in its destructive impact on an individual's personal freedoms. *Donaldson v. O'Connor*, 5th Cir. 1974, 493 F.2d 507, 520, vacated and remanded, 1975, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396. The due process clause permits this kind of interference with the liberty of a human being only if it can be justified by some permissible governmental interest. *Wyatt v. Aderholt*, 5th Cir. 1974, 503 F.2d 1305, 1312; *Donaldson v. O'Connor*, supra, 493 F.2d at 520. Long-term detention of an individual is ordinarily a denial of due process except when he has been proved, in a proceeding subject to the rigorous constitutional limitations of the due process clause and the Bill of Rights, to have committed a specific act defined as an offense against the state, and for which incarceration is permitted for a fixed term only. If an individual, adult or child, healthy or ill, is confined by the government for some reason other than his commission of a criminal offense, the state must provide some benefit to the individual in return for the deprivation of his liberty. Thus,

(W)hen the three central limitations on the government's power to detain—that detention be in retribution for a specific offense, that it be limited to a fixed term, and that it be permitted after a proceeding where fundamental procedural safe-

guards are observed—are absent, there must be a *quid pro quo* extended by the government to justify confinement.

*Donaldson v. O'Connor, supra,* 493 F.2d at 522.

■ That *quid pro quo* is care or treatment of the kind required to achieve the purpose of confinement. Thus where hospitalization for illness is imposed, treatment for that illness is required. If this requirement is not met, hospitalization is "equivalent to placement in 'a penitentiary where one could be held indefinitely for no convicted offense.'" *Ragsdale v. Overholser*, 1960, 108 U.S.App.D.C. 308, 315, 281 F.2d 943, 950, Fahy, J., concurring. See also, *Welsch v. Likins*, D.Minn.1974, 373 F.Supp. 487, 497; *Donaldson v. O'Connor*, supra, 493 F.2d at 522 n.22.

■ Though the term "least restrictive setting" is more a slogan than a constitutional imperative, it does serve as a convenient way to sum up the standard applicable to all governmental restrictions on fundamental personal liberties, as set forth in *Shelton v. Tucker*, 1960, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231:

. . . (E)ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in light of less drastic means for achieving the same basic purpose.

This mandate was applied to confinement of the adult mentally retarded, civilly committed to a state institution, in *Donaldson v. O'Connor*, 5th Cir. 1974, 493 F.2d 507 (a suit for damages for failure over a 14½ year period to treat adequately a person diagnosed as "paranoid schizophrenic") and in *Wyatt v. Aderholt*, 5th Cir. 1974, 503 F.2d 1305, (the appellate review of the decree in *Wyatt v. Stickney*, M.D.Ala.1972, 344 F.Supp. 373, and 344 F.Supp. 387, dealing with the institutional standards for care and treatment of civilly committed adults in a single state institution). In *Wyatt v. Aderholt* the controlling principle was stated:

In *Donaldson*, we held that civilly committed mental patients have a constitutional right to such individual treatment as will help each of them to be cured or to improve his or her mental condition. We reasoned that the only permissible justification for civil commitment, and for the massive abridgments of constitutionally protected liberties it entails, were the danger posed by the individual committed to himself or to others, or the individual's need for treatment and care. We held that where the justification for commitment was treatment, it offended the fundamentals of due process if treatment were not in fact provided; and we held that where the justification was the danger to self or to others, then treatment had to be provided as the *quid pro quo* society had to pay as the price of the extra safety it derived from the denial of individuals' liberty. 503 F.2d at 1312.

The argument was made in *Wyatt v. Aderholt*, as it is here, that it is in some instances an act of mercy for the state to give a child better custodial care than it could receive at home and to relieve "the 'burden' imposed upon the families and friends of the mentally disabled." 503 F.2d at 1313. No compassionate human being could fail to be moved by the plight of the children who are plaintiffs. Nor can that tragedy be viewed in isolation as the child's alone. For in many instances, the child's family is wrenched by the calamity. There is interaction between family and child, child and family, so intricately entwined that the family's disorder heightens the child's, and the child's plight rends the family. Unable to care for the child, parents are willing, sometimes eager, to have the child placed elsewhere if only to obtain the adequate custodial care that they can no longer manage to provide.

█ But, "the 'need to care' for the mentally ill—and to relieve their families, friends, or guardians of the burdens of doing so" cannot "supply a constitutional basis for civil commitment." *Wyatt v. Aderholt*,

503 F.2d at 1313.[4] The civil commitment of any person rests on what is labelled in *Wyatt v. Stickney*, supra, as,

> . . . the *quid pro quo* concept of rehabilitative treatment, or, where rehabilitation is impossible, minimally adequate habilitation and care, beyond the subsistence level custodial care that would be provided in a penitentiary.

The Supreme Court said over 50 years ago in *Meyer v. Nebraska*, 1923, 262 U.S. 390, 401–2, 43 S.Ct. 625, 627, 67 L.Ed. 1042, "For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide . . . (that) 'the offspring of the inferior, or of the better when they chance to be deformed, will be put in some mysterious, unknown place, as they should be,'" but such ideas could not be imposed by "any legislature . . . without doing violence to both letter and spirit of the Constitution." Id. at 401–402, 43 S.Ct. at 627. Thus, when the state chooses, for the most humane motives, to offer or require institutional confinement of a person, it must consider means that are capable of achieving its purposes in ways that are least stifling to personal liberty, and it must offer a therapeutic consideration, a *quid pro quo*, for the deprivation.

█ But the imperative that least drastic means be considered does not imply a constitutional right on the part of every individual to a personal judicial determination that the means being employed to improve his condition are the best possible or the least restrictive conceivable. What is required is that the state give thoughtful consideration to the needs of the individual, treating him constructively and in accordance with his own situation, rather than automatically placing in institutions, perhaps far from home and perhaps forever, all for whom families cannot care and all who are rejected by family or society.

█ Similarly, the constitutional right to some *quid pro quo* does not imply a right to the *best* treatment available, any more

---

4. Reflection will demonstrate that constitutional rights may not be abridged by government action on the basis that at least the individual is "better off" than he would otherwise have been. Confinement is proscribed even though the committed person lived a life outside the institution that was even worse.

than the right to counsel means the right to the nation's foremost trial lawyer. Logic, economics, and the scarcity of human resources make it impossible to supply the finest to everyone. Nor are courts, or child rehabilitation experts, however skilled, equipped to determine infallibly what is optimum. The *quid pro quo* the state must provide is treatment based on expert advice reasonably designed to affect the purposes of state action. Thus, in *Wyatt v. Aderholt*, supra,

> (T)he plaintiffs here do not seek to *guarantee* that all patients will receive all the treatment they need or that may be appropriate to them. They seek only to ensure that conditions in the state institutions will be such that the patients confined there will have a *chance* to receive adequate treatment. 503 F.2d at 1317. (Emphasis in original.)

It has been asserted, "among professionals in the behavioral disciplines, there is virtually unanimous condemnation of large-scale state child-caring institutions and *equal support of community services to children* that do not rigidly segregate them by imposing either geographic distance or pejorative labels on them." Burt, Developing Constitutional Rights Of, In, And For Children, 1975, 39 Law and Contemporary Problems 118, 138. "This critique," Dr. Burt continues, "has met powerful resistance from many sources—from legislators who are unwilling to appropriate new funds or to abandon the capital investments in mammoth existing buildings; from specialized professionals who have built their careers either in serving these 'special children' or in refusing to serve them because they were not 'normal'; and from parents who find relief from the burdens of their difficult children by consigning them to state institutions." Ibid.

Thus, although their position is considered based on self-interest, some "specialized professionals" resist the theses advanced by plaintiffs. It is further indicative of opinion differences in this area that Dr. Burt considers that the problem should not be approached on the basis of the constitutional right to treatment. He considers, "the retardate institution does, in its present guise efficiently accomplish one purpose—to hide from sight abnormal and frightening children." Id. at 139. Yet virtually all the experts in the present case agreed that some children in the plaintiff class must for therapeutic reasons be placed in institutional settings. The differences relate to the scale and type of institution, the goals of treatment, and methods of achieving them.

Even if it is assumed that the ideal is capable of determination, to afford every member of the plaintiff class that kind and quality of care that is model would require far more than the relief accorded in *Wyatt*. There the court adopted the thesis that no adult should be civilly committed to a single overcrowded Alabama institution if services and programs in the community "can afford *adequate* habilitation to such person." (Emphasis supplied.) 344 F.Supp. at 396. Corollary to that the court required that "(r)esidents shall have a right to the *least restrictive conditions* necessary to achieve the purpose of habilitation." Id. (Emphasis supplied.)

The phrase thus used is here sought to be expanded into a declaration far broader than that the United States Constitution forbids the commitment of any child to an institution under any program for any purpose unless other methods are inadequate; the plaintiffs seek a determination that the goal of institutional care must be return of the child to home and community and thus the child must: (a) not be committed to an institution in Texas (and, of course, by inference that precludes commitment to any out-of-state institution); (b) be committed to an institution near the child's home (and then only if no other program can be found); (c) not be committed to a large scale institution.

█ Many of the plaintiff's expert witnesses presented what I considered sound expositions of what is presently known concerning the most desirable ways to treat children. But, just as "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics," *Lochner v. N. Y.*, 1905, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (Holmes, J., dissenting) it does not codify

current psychological theories concerning child development or the treatment of the mentally retarded.

In developing the substantive requirements implicit in the constitutional mandate of due process, courts must be careful not to impose inexorable bonds that incorporate judicial sentiments, however noble, or contemporary theories, whether social, economic, medical or psychological. Even though the constitution's precepts are evolutionary, it is after all a constitution, and not a textbook that can be revised periodically. "In such circumstances, the judiciary is well advised to refrain from imposing on the state inflexible constitutional restraints that could circumvent or handicap the continual research and exploration so vital to finding even partial solutions to educational problems and to keeping abreast of ever changing conditions." *San Antonio Independent School District v. Rodriguez*, 1972, 411 U.S. 1, 42, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16. The same precept applies to problems of child habilitation.

Highly qualified persons, fully trained and experienced in treating mentally retarded, physically handicapped and delinquent children, may differ, as the testimony in this case makes clear, on the basic standards of treatment and their application to an individual child. New treatment methods are attempted; sometimes they succeed, but sometimes they fail. The constitutional right to treatment is a right to a program of treatment that affords the individual a reasonable chance to acquire and maintain those life skills that enable him to cope as effectively as his own capacities permit with the demands of his own person and of his environment and to raise the level of his physical, mental and social efficiency.[5]

Those who have read carefully Judge Johnson's perceptive opinion in *Wyatt v. Stickney, supra*, will recognize that I have altered somewhat the wording of the standard for "habilitation" set forth by him. I do so advisedly but not by way of demonstrating a difference in view. That case dealt with one kind of person only,—the adult mentally retarded. The individual variations within that group may be great but they do not approach the differences in the various children who comprise the plaintiff class. There is a vast difference between a child who has average intelligence or is only slightly retarded but is socially delinquent and one who not only has an I.Q. below 20 but also suffers severe physical disability and emotional problems. One prescription will not suffice for all. What the constitution requires as the state's due to the individual it confines is a program that is proper for that individual. Accordingly, the decree will require the development of a treatment plan for each individual child, and will set forth some basic standards for the development of that plan.

But the a priori thesis that Texas and all other states than Louisiana are tainted must be rejected. Each child must receive proper care wherever that child is placed. What is proper must be determined separately for each child based on that child's personal attributes and needs. What is proper for a particular child includes consideration not only of whether the child should be placed in an institution or treated in the community; it also includes consideration of the kind and geographic location of the institution or place of treatment. Louisiana has announced its intention that all children who are not being treated in the state will be returned as soon as possible. Except where a child's treatment program requires it, automatic and immediate return of each child to Louisiana is not a specific. The persons preparing the treatment plans for each child will be required to consider the least restrictive alternative for that child, but the state will not be required to develop an entire new system of facilities to implement the plans.

Each of the children will be returned to Louisiana for preparation of a

---

5. Compare the decree in *Wyatt v. Stickney*, 344 F.Supp. 381 at 389 n. 1, defining the constitutional right as the right "to receive such individual treatment as (would) give each of them a realistic opportunity to be cured or to improve his or her mental conditions."

treatment plan. Plaintiffs' counsel seeks to have the court impose special restrictions on the return of any child to a Texas (hence, by implication, to any out-of-state) facility so that this could not be done unless it were shown to be in that child's "individual best interest." This would likely preclude the placement of any child out-of-state, and would inevitably lead to what plaintiff's counsel have accurately characterized as "dumping" the children somewhere in Louisiana. There are, as the evidence makes clear, insufficient facilities in Louisiana *now* to care for all the children. A survey of facilities will be required. In the meanwhile humane care and treatment for the children will be ordered. Adopting a suggestion made in the state's brief, the state defendants will be required to provide proper care and treatment for the children in the best available environment.

### C. *Which Plaintiffs Have the Right*

All of the children who have been committed under the ECA program receive ECA assistance. That program is supported by federal funds and is subject to the requirements of the Social Security Act. Section 408 of the Social Security Act provides federal reimbursement for the cost of foster care for AFDC recipients who have been placed in foster care or child-caring institutions pursuant to court order. Section 408(f)(1) of the Social Security Act requires states receiving AFDC funds to develop:

"a plan for each child (including periodic review of the necessity for the child's being in a foster family home or childcare institution) to assure that he receives proper care and that services are provided which are designed to improve the conditions in the home from which he was removed or to otherwise make possible

his being placed in the home of a relative . . . ."

42 U.S.C. § 608(f)(1).

The standard adopted by the statute is "proper care." These words in the statute appear to mean the same kind of *quid pro quo* that the constitution requires for children committed by state action. Children whose placement is subject to the mandate of the Social Security Act are guaranteed the proper care that the constitution requires for those in state custody.[6]

Before proceeding to outline a decree that incorporates these standards, we must consider other issues in this particular case that affect the decree.

### III. MISTREATMENT AND MISPLACEMENT

Louisiana has in recent years greatly expanded its institutions and programs for children in the plaintiff class and the others of like characteristics who remain in the state or have been sent to states other than Texas. At a time when the state approaches a financial crisis, it has constantly increased its expenditures for these programs. While Louisiana's thesis concerning what the constitution requires in the way of treatment differs from the view here taken, the state has as a matter of official policy sought at least to provide humane custodial care for every child in all of the programs involved in this case.

But it should come as no surprise to any observer of bureaucracy in operation, public or private, that Louisiana's program has on occasion functioned badly. Thus in many instances, Louisiana children have been placed in Texas institutions inappropriate to the needs of the particular child

---

**6.** Hence it is unnecessary to reach the issue whether by constitutional standards all children in the ECA program are involuntarily committed; this was dealt with in *Wyatt v. Stickney*, 344 F.Supp. at 390 n. 5, as follows:

The Court will deal in this decree only with residents involuntarily committed to Partlow because no evidence has been adduced tending to demonstrate that any resident is volun-

tarily confined in that institution. The Court will presume, therefore, that every resident of Partlow is entitled to constitutionally minimum habilitation. The burden falls squarely upon the institution to prove that a particular resident has not been involuntarily committed, and only if defendants satisfy this difficult burden of proof will the Court be con-

involved.[7] In many other instances, children in some Texas institutions have been physically mistreated. Partly as a result of the filing of this suit, children have been removed from a number of Texas institutions where abuses had occurred. However, children remain in other institutions where the plaintiffs contend they suffer unnecessary punishment, excessive physical and psychopharmacological restraints, and interference with their freedom of communication with their parents and others. The institutions involved are dealt with specifically in Appendix A. The decree will deal separately with each institution based on the conclusions reached with respect to it.

## IV. RACIAL DISCRIMINATION

Black children are placed in Texas institutions at a disproportionately higher rate than white children. The evidence does not indicate that this is a result either of conscious discrimination or intentional state action. Instead, it reflects the fact that privately operated institutions in Louisiana accept disproportionately higher numbers of white children or refuse to accept proportionate numbers of black children. Some privately run Louisiana facilities at which ECA children are placed are racially segregated. The result is that a larger proportion of black children remain to be placed out of the state.

■ All of the Louisiana children placed at several Texas institutions are black,[8] and virtually all the children placed at other institutions are black. The problem of racial separation at some of these institutions was ended when, after institution of this suit, the Louisiana children were removed, not to eliminate racial discrimination but because the facilities were providing inadequate care. It appears to be necessary, however, to formulate standards that will assure that Louisiana's contracts with private agencies protect against racial discrim-

ination, just as its policies in state-run programs already do.

## V. DISCRIMINATION AGAINST LOUISIANA INSTITUTIONS

The Texas institutions at which Louisiana children are placed are privately run, in most instances for profit. The board rate paid by LHHRA to residential facilities in Louisiana is much less than the rate paid to Texas residential facilities. As we have seen, the publicly run Louisiana institutions cannot accommodate all of the children requiring care. There are a number of privately run Louisiana institutions, all of them non-profit, operated by eleemosynary or philanthropic agencies that have accepted children like those in the plaintiff class and would accept more if they were adequately compensated. Some children are placed in foster homes in Louisiana. The rate paid foster parents is much less than the cost of care for the child. More foster persons would accept children if the amount paid them were adequate.

Yet, despite the shortage of facilities in Louisiana, the economic theory that supply will respond to demand is being ignored and, in some sort of anti-parochialism, LHHRA is paying Texas institutions far more than it is paying Louisiana institutions. The private suppliers of every kind of Louisiana residential program are being paid less than the cost of the program they supply, and less than is being paid to Texas profit-making institutions.

This discrimination against local interests is not explained anywhere in the State's evidence. Some effort is made to account for part of it on the basis that the Texas institutions accept children who need more extensive care. But the evidence satisfies me that Louisiana institutions would accommodate children who are hard to care for if they were not required to do so at a loss. The low board rate paid Louisiana facilities has discouraged the establishment

---

fronted with whether the voluntarily committed resident has a right to habilitation.

7. These include Texas Children's Home, Fred Day's Home for Children, Sunset Acres, Lullabye Children's Home.

8. These include Woodacres, Bayley, Peaceful Valley, and Heart of Texas.

of new child facilities and has limited the available of in-state placement.[9]

■ The Louisiana institutions are not parties to this suit. But the decree will incorporate standards for paying them because the children's habilitation plans cannot be implemented unless placement in Louisiana is at least no more onerous than placement out of the state.

The court has formulated proposed standards in Appendix B. Since the parties have not had a chance specifically to consider these, a hearing will be held to consider opposition to any part of them, as well as suggestions for their improvement and any issues pertaining to attorney's fees. Thereafter a decree will be entered. That decree will:

A. reserve jurisdiction of this cause;

B. differentiate immediate and long range programs;

C. require the defendants to file reports by the first of August and first of February each year hereafter reflecting conditions at the end of June and the end of December respectively, reflecting in detail the progress on the implementation of this order;

D. enjoin the defendants from failing to implement fully and with dispatch each of the standards set forth in Appendix B.

### SUPPLEMENTAL REASONS FOR COURT'S ORDER

On July 26, 1976, the Court distributed a proposed order to counsel; it then received their written suggestions and oral arguments with respect to it. After considering these fully, the order has been revised, and it is now attached.

This revised order has been carefully reviewed in the light of the opinion of the U.S. Supreme Court in *O'Connor v. Donaldson*, 1975, 422 U.S. 563, 95 S.Ct. 2486, 45

L.Ed.2d 396. The Fifth Circuit opinion in *Wyatt v. Aderholt*, 1974, 503 F.2d 1305, rested on the thesis that the State must supply a *quid pro quo* to justify civil commitment of an individual. These observations, and that rationale, were referred to in this Court's initial opinion. After the opinion in *Wyatt* was written, the Supreme Court observed in *O'Connor*, . . . "We accordingly have no occasion here to decide whether persons committed on grounds of dangerousness enjoy a 'right to treatment'." 422 U.S. at 571, 95 S.Ct. at 2491, n.6.

■ While this expression was limited to "persons committed on grounds of dangerousness," the opinion carefully refrains from any expression of approval, or disapproval, of the *quid pro quo* thesis, and the concurring opinion of the Chief Justice expressly rejects it as a basis for State action. Therefore, this Court's order has been carefully reviewed to determine whether it rests on that concept. After full restudy of *O'Connor* and the attached order, I have concluded that the requirements imposed on the State are exacted by the constitutional rights of the plaintiff children, even if, as the Chief Justice has stated in his concurring opinion in *O'Connor*, the confinement of the mentally ill, mentally retarded, or physically handicapped children requiring care, and others embraced in the plaintiffs' claim, is based on the State's historic role as *parens patriae*.

The majority opinion in *O'Connor*, concurred in by the Chief Justice, states: "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement." 422 U.S. at 575, 95 S.Ct. at 2493.

■ A fortiori, the State cannot confine a child who is mentally retarded or physi-

---

9. Indeed the court does not perceive why, if private institutions for profit can be operated in Texas, they could not be run here on the same basis. If the standards of care are the same in Texas as in Louisiana, then it should cost no more to operate the institutions in Louisiana, and the fee that yields a profit in Texas ought to yield a profit here. But there is no evidence on the issue and the court is left to speculate whether standards are lower in Texas, wages and expenses are lower there, entrepreneurial initiative is greater there, or there is some other reason why privately run institutions offer these services in Texas but, apparently, not in Louisiana.

cally handicapped for simple custodial purposes.

In *O'Connor*, the Court continued:

"May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community?"

\* \* \* \* \* \*

[A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends. 422 U.S. at 575, 95 S.Ct. at 2493–2494.

 The principle implicit in this analysis dictates that the DFS children be removed from the institutions that are not providing safe and adequate care. It also makes it clear that these involuntarily confined children must be accorded more than custodial care far from home. No showing has been made that any of the DFS children is confined "to ensure his own survival or safety", or that any of the children has no willing or responsible family friend who would assure his survival, so it is unnecessary to determine whether mere custodial care is adequate for children who are taken into state custody for his own survival or safety.

 The necessity for treatment of ECA children rests on a different basis. The State is required by federal statute, 42 U.S.C. § 608(f) to develop "a plan for each child . . . to assure that he receives proper care." This appears to contemplate more than merely keeping the child in safe custody. It is conceivable that a properly developed plan for some individual child might regard that child's situation as so hopeless or parlous that, either for the moment, or for the indefinite future, only custodial care can be accomplished. If that should be the situation of any child, the individual treatment plan can best determine it.

REASONS FOR CHANGES IN, AND FOR REJECTION OF PROPOSED CHANGES IN, PROPOSED ORDER

In general, the Court has tried to avoid ordering the parties to comply with an order that would have the infinite detail of a set of engineering specifications. It has attempted to write guidelines that would prevent child abuse and assure good treatment for children without writing an order that would require infinite precautions against spectral perils and without enmeshing treatment personnel in a bureaucracy. The children affected by this order will each have treatment plans; they will each be in a therapeutic institution; the institution and the child's plan will be subject to periodic review. These basic safeguards are essential, but, in some respects at least, they make certain detailed procedures sought by plaintiffs and plaintiff-intervenors unnecessary.

## I. REVIEW OF TREATMENT PLAN (par. 2.4)

It is desirable that persons who are not connected with the institution treating a child participate in the semi-annual review of the treatment plan. Even the best qualified persons acquire a bias in favor of the institutions with which they are connected. Hence, only one of the two or more persons who conduct the semi-annual review of a child's treatment plan may be connected with the institution or facility treating the child.

The proposed order is further altered to make it clear who may participate in the semi-annual review and to assure that changes then made in the treatment plan are implemented.

## II. REPORTS (par. 2.5)

Semi-annual progress reports are required to be submitted to the court and counsel for plaintiffs and plaintiff-intervenors containing sufficient information to permit progress in following the court's order to be monitored.

## III. VISITATION RIGHTS (par. 3.4)

A child should have the unrestricted right to be visited by his parents and parents should have the right to visit their children. Parental visits serve both a therapeutic and a monitoring purpose; it is the child's parents who can most accurately observe the child's progress and who ordinarily would be most likely to report departures from the treatment plan or institutional deficiencies.

In some cases, visits by others may be disturbing to the child's treatment. The only reason to confine a child is to afford him treatment; emotional disturbances are to be avoided. Hence, under carefully circumscribed conditions, visits by others than the child's parents may be restricted. However, a restrictive order must be in writing, and can extend for only thirty days. It must then be reviewed and, if renewed, the reasons for renewal must be stated in writing.

## IV. MAIL (par. 3.5)

A child should be free to communicate with anyone. The only access many children will have to the outside world is by mail, and only in this way can the child make known mistreatment or abuse. Generally the child should also be free to receive incoming mail. But the only reason for a child to be in an institution is for treatment; hence mail that would interfere with this treatment should be monitored.

The First Amendment right to free communication is fundamental. But it is no more basic or pervasive than the right to liberty of the body. If the state is permitted to take a child into custody for treatment, the whole reason for that treatment should not be destroyed by permitting disturbing influences to continue to work on the child. Hence, under carefully circumscribed conditions, incoming mail may be censored when this is necessary to prevent serious harm to the child and the restriction is prescribed in writing by a qualified staff personnel. The restriction must be for a definite period, not to exceed one month, and rules are set forth to assure that the restriction is not abused.

The institution is required to make stationery available. No reason is seen to require the institution to furnish postage or funds for other personal expenses such as telephone calls or personal desires.

## V. INTERACTION WITH OPPOSITE SEX (par. 3.6)

The court's original order requires opportunities to interact with members of the opposite sex except where a qualified professional responsible for a child's treatment plan orders otherwise and puts the reasons for the order in writing. The detailed time limits and additional restrictions on this type of order proposed by the plaintiffs and plaintiff-intervenors appear unnecessary. The restriction is not likely to be imposed frequently; if there appears to be abuse in prescribing this type of order, relief can be sought.

## VI. MEDICATION (par. 3.8)

The provisions of the original order requiring monthly renewal of prescriptions appear adequate. The State's suggestion that it be removed is rejected because, under federal law, psychotropic drugs are classified under either Schedules II, III or IV, 21 C.F.R. §§ 1308.12–1308.14, and the most stringent restrictions (those for Schedule II drugs) limit physicians to prescriptions lasting *six months,* 21 U.S.C. § 829.

On the other hand, the plaintiffs and plaintiff-intervenors suggestions of more rigid regulation are rejected. While the evidence in this case revealed extensive overdrugging and lax medical monitoring of drug usage, particularly of psychotropic medication, children have been removed from the most hazardous institution, and more careful monitoring of other institutions is assured by the other provisions of this order.

## VII. USE OF LOCKED ROOMS (par. 3.12)

The State has presented no reason why it should be necessary to place a child in a locked room. If a child must be physically restrained to prevent the child from harming himself or others, or running away, provisions for such restraint are made in

paragraph 3.13. The plaintiffs' and plaintiff-intervenors suggestions, however, that it be necessary for a physician to prescribe restraints is rejected; it is sufficient if a qualified professional does so. The expertise required for this situation is different from that necessary in drug prescription. The time limits and other restrictions are sufficient to prevent abuse.

Provision is made for use of physical restraints in an emergency on the order of the superintendent of the institution.

## VIII. CHILD WORK (par. 3.17)

A set of detailed provisions regulating institutional maintenance and other work by children has been formulated, largely in accordance with the agreement of the parties.

## IX. SPECIAL MASTER

The part of the Court's Order dealing with a Special Master is deleted. It will be covered in a later order.

## ORDER WITH RESPECT TO CHILDREN IN TEXAS INSTITUTIONS

*Definitions*

The following terms are hereby defined for purposes of the remainder of this Order:

1. *CHILD*—A Louisiana citizen who has been placed or housed prior to the age of twenty-one in a Texas child-caring institution at any time since September 3, 1973, and prior to July 26, 1976, on the order or with the funding, in whole or in any part, of the Louisiana Health and Human Resources Administration (LHHRA).
2. *SUPERINTENDENT*—the person who is primarily responsible for the operation of any institution as defined below.
3. *INSTITUTION*—any facility or program for the care and treatment of persons outside their homes including, both residential and day care facilities or programs.
4. *QUALIFIED PROFESSIONAL*—
 (a) A psychologist with at least a master's degree from an accredited program and with specialized training or two years of experience in treating emotionally disturbed, mentally retarded or learning disabled children whose condition is similar to the condition of the children being served.
 (b) A physician licensed under State law to practice medicine or osteopathy and with specialized training or two years of experience in treating emotionally disturbed, mentally retarded or learning disabled children whose condition is similar to that of the children being served.

## I. ADEQUATE TREATMENT

1.1 Each child has the right to care, education, medical and personal treatment suited to his characteristics and needs regardless of his age, degree of retardation or handicapping conditions. This comprehensive care is referred to in this order simply as "treatment."

1.2 Treatment must be provided for each child in accordance with a program developed specifically for him. The program must be one designed to maximize his human abilities, enhance his ability to cope with his environment, enable him to develop and realize his fullest potential, and equip him to live as normally as possible.

1.3 No child shall be placed in an institution unless the child's treatment plan prescribes this placement on the basis that residence in an institution is the least restrictive setting feasible for that child. The personnel preparing the treatment plan shall consider the child's personal attributes, the situation of the child's family, the ability of the family to furnish a home environment that will permit the child to take advantage of community services and programs, and any other factors relevant to determining a program that is suited to the needs of that individual child. The availability in the child's home community of services and programs likely to afford adequate treatment shall be considered, but the fact that such services and programs are not immediately available should not be conclusive.

1.4 The treatment program for each child shall include a plan for educational services

consistent with the child's abilities and needs, taking into account his chronological age, degree of retardation and disabilities or handicaps.

1.5 Each child shall have the right to receive prompt and adequate medical treatment for any physical ailments and for the prevention of any illness or disability. Such medical treatment shall meet the standards of medical practice in the community.

## II. INDIVIDUALIZED TREATMENT PLANS

2.1 LHHRA shall immediately contract with the Department of Psychiatry and Biobehavioral Sciences of the Louisiana State University School of Medicine in New Orleans, (LSU) to provide each child with a complete professional evaluation of his educational, medical, psychological, social, recreational and residential needs, and to develop for him a detailed individual plan specifying the programs, services and living situation necessary for that child consistent with the principles set forth above. In accordance with the agreement reached in the interim order, each plan shall be consistent with the principle that, whenever possible, a child shall be placed in his own home or a foster home, and, if that is not possible, within reasonable proximity to his family. The evaluation shall include consultation with the child's family, or, where appropriate, foster family, to determine the child's developmental history and his performance in a variety of settings. The evaluation shall be conducted and the plan developed by a team including, but not limited to, child psychiatrists, pediatricians, psychologists, social workers, and special education teachers under the supervision and direction of Dr. William Easson, Chairman of the Department of Psychiatry and Biobehavioral Sciences. LHHRA shall pay LSU for the cost of each such evaluation and habilitation plan. LHHRA shall return each Louisiana child presently housed in a Texas institution to Louisiana, at no cost to the child or his or her family, to be examined and evaluated by LSU. Where appropriate, the children whose families or foster families live in the greater New Orleans area shall be housed with their families. All other children shall be housed as appropriate at Southeast Louisiana State Hospital (Mandeville), Belle Chasse State School, or any other facility agreed by counsel for plaintiffs, plaintiff-intervenor and state defendants. If they cannot agree, the facility will be designated by the court. To the extent necessary to conduct the evaluation, LHHRA shall provide daily transportation for each child to LSU at no cost to the child or his family. LHHRA shall begin to return children to Louisiana immediately and shall continue to do so at a rate sufficient to allow LSU to conduct and complete the evaluations without delay. Dr. Easson will be requested to submit a progress report to the court and all counsel stating the names of children examined to date, the methods of examination, the kinds of treatment suggested and other information that may be helpful to the court on the last day of September, and on the last day of each calendar quarter thereafter.

2.2 In the interest of continuity of care, a single qualified professional shall be assigned to supervise the implementation of each child's treatment plan, integrating the various aspects of the child's program, and recording the child's progress as measured by objective indicators. This qualified professional shall also be responsible for ensuring that the child is released when appropriate to a less restrictive residential setting.

2.3 Each individual plan shall be constantly reviewed by the qualified professional responsible for supervising its implementation and shall be modified if necessary.

2.4 Six months after admission of each child to an institution and at least annually thereafter, a comprehensive psychological, social, educational and medical diagnosis and evaluation shall be prepared for that child, and his treatment plan shall be reviewed by an interdisciplinary team of no less than two qualified professionals (only one of whom may be from the facility or program in which the child is placed), child care workers directly involved in the child's care and treatment, other professionals as appropriate, the LHHRA case worker assigned pursuant to paragraph 6.4, below, and the child's parents, foster parents, or tutor. Any changes in the child's treat-

ment plan- recommended by this team shall be implemented by LHHRA in accordance with paragraph 2.5, below.

Complete records for each child shall be maintained and shall be readily available to both the qualified professionals and the resident care workers who are directly involved with the particular child. All information contained in a child's records shall be · considered privileged and confidential. The parent or tutor of the child shall be permitted access to the child's records. These records shall include:

2.41 Identification data, including the child's legal status;

2.42 The child's history, including but not limited to:
(1) family data, educational background, and employment record;
(2) prior medical history, both physical and mental including prior institutionalization;

2.43 The child's grievances if any;

2.44 An inventory of the child's life skills;

2.45 A record of each physical examination describing the results of the examination;

2.46 A copy of the child's individual plan and any modifications thereto and an appropriate summary to guide and assist resident care workers in implementing the child's program;

2.47 The findings made in periodic reviews of the plan, including an analysis of the successes and failures of the child's program and recommendations for any modifications deemed necessary;

2.48 A copy of the post-institutionalization plan and any modifications thereto, and a summary of the steps that have been taken to implement that plan;

2.49 History and present status with respect to medication;

2.410 A summary of each significant contact with the child by a qualified professional;

2.411 A summary of the child's response to his program, prepared by a qualified professional involved in the child's treatment and recorded at least monthly. Such response, wherever possible, shall be scientifically documented;

2.412 A signed order by a qualified professional for any physical restraints, as provided below;

2.413 A description of any extraordinary incident or accident in the institution involving the child, to be entered by a staff member noting personal knowledge of the incident or accident or other source of information, including any reports of investigations of mistreatment of the child, as required below;

2.414 A summary of family visits and contacts;

2.415 A summary of attendance and leaves from the institution;

2.416 A record of any seizures, illnesses, treatments thereof, and immunizations.

2.5 LHHRA shall implement all of the individual treatment plans as soon as practicable, to the extent this can be done by expending on each child, when necessary to obtain the required programs, services and living situation, an amount at least equivalent to the average amount presently being expended *per capita* for the Louisiana children currently housed in Texas institutions. The state is to provide proper care and treatment for the children in the best available environment, wherever it might be located.

LHHRA shall submit a detailed progress report to the court and to counsel for all parties in interest on the first of February and first of August each year hereafter reflecting the status of the implementation of this decree at the end of December and the end of June, respectively. Furthermore, each child's treatment plan developed by LSU, each subsequent modification in the plan by a status-review team, and all LHHRA records pertaining to that child (including, but not limited to, all information relating to implementation of the treatment plan) shall be subject to examination by counsel for plaintiffs and plain-

tiff-intervenor or by any experts selected by them. No personally identifiable information obtained from the examination of the records described above shall be made available to any person for any purpose not connected with this litigation.

### III. HUMANE PHYSICAL AND PSYCHOLOGICAL ENVIRONMENT

3.1 Each child has a right to care provided in a dignified and humane manner, and to such privacy as is possible consistent with the child's treatment plan.

3.2 The confinement of a child to an institution shall not of itself cause the child to lose any of the rights enjoyed by citizens of Louisiana and of the United States; no child shall be deprived of these rights except when the determination is made by an appropriate court.

3.3 Each child shall have the right to telephone communication with his parents or tutor to the extent consistent with reasonable institutional regulations. The child shall also have the right to telephone communication with others except to the extent that a qualified professional responsible for formulation of a particular child's habilitation plan writes an order imposing special restrictions and explains the reasons for any such restrictions. The written order must be renewed semiannually if any restrictions are to be continued.

3.4 Each child shall have the unrestricted right, consistent with reasonable institutional regulations, to visits by and to his parents, foster family or tutor. Visits by and to other persons shall be limited only to the extent that a special restriction is required by the child's individual treatment plan (either as developed initially by LSU or as modified subsequently by the status review team pursuant to standard 2.4, above) as necessary to prevent serious harm to the child.

The reasons for any such restriction must be explained in writing. The written order must be reviewed at the end of thirty days and shall be renewed only by the status review team pursuant to standard 2.4, above. Reasons for renewal must be recorded in the child's records.

At any time, however, the qualified professional responsible for supervising implementation of the child's treatment plan pursuant to standard 2.3, above, shall be able to terminate such a restriction.

3.5 Each child shall be entitled to receive and send sealed mail, without any form of censorship or invasion of privacy, unless, in the case of a child who is emotionally disturbed, a restriction on incoming mail is recommended by a qualified professional as being necessary to prevent serious harm to the child, and such restriction is prescribed in writing by that qualified professional for a definite period not to exceed one month, in conjunction with therapy being received by the child. In the event that such a restriction is prescribed:

(a) a letter may be censored only after a qualified professional has reviewed the contents of that letter and determined that withholding of the letter from that child is necessary to prevent serious harm to the child;

(b) the entire letter must be withheld;

(c) a copy of the withheld letter must be returned to the sender, along with notification that the letter was withheld and the reasons for the censorship;

(d) the facility must retain copies of both the letter withheld and the notification letter sent to the sender, in conformity with subparagraph (c) of this paragraph, and the facility must maintain a log listing all letters withheld; and

(e) the facility must make available copies of the letters and log, described in subparagraphs (c) · and (d), to LHHRA and counsel for the plaintiffs, upon request.

Anything in this paragraph to the contrary notwithstanding, it shall be the duty of the institution to furnish to each child all materials and assistance reasonably necessary to facilitate sending and reading mail.

3.6 Under appropriate supervision, each child shall be provided with suitable opportunities for interaction with members of the opposite sex, except where a qualified professional responsible for the formulation of

a particular child's treatment plan writes an order to the contrary and explains the reasons therefor.

3.7 No medication shall be administered unless a written order of a physician prescribes it in writing.

3.8 The medication prescribed for each child shall be noted in his records. At least monthly the attending physician shall review the drug regimen of each child under his care. All prescriptions shall be written with a termination date, which shall not exceed 30 days. The child's records shall state the effects of psychoactive medication on the child. Unnecessary or excessive medication shall not be administered to any child.

3.9 Medication shall not be used as punishment, for the convenience of staff, as a substitute for a treatment program, or in quantities that interfere with the child's treatment program.

3.10 No medication shall be administered except by persons who have been appropriately trained.

3.11 No child shall be placed alone in a locked room, either as punishment or for any other purpose. Legitimate "time out" procedures may be utilized under close and direct professional supervision.

3.12 These standards shall apply to "time out" procedures.

3.121 They are to be imposed only when less restrictive measures are not feasible;

3.122 Placement shall be in an unlocked room with a staff member constantly nearby in a place where the staff member can supervise the child;

3.123 The child shall have access to bathroom facilities as needed;

3.124 The period of isolation or segregation shall not exceed 12 hours unless renewed by a qualified professional;

3.125 Except in an emergency situation in which it is likely that a child would harm himself or others, the decision to place a child in "time out" shall be made pursuant to a written order by a qualified professional, following a personal interview with the child and an evaluation of the episode or situation said to require isolation or segregation. Any such order must specify the terms and conditions of "time out" and the rationale for the decision; and

3.126 Emergency use of "time out" shall be authorized only by the superintendent of the institution, shall be limited to a period of not more than one hour and shall conform to all of the provisions set forth in subparagraphs 3.121–3.123 of this paragraph. (The attention of the parties is invited to the situation that may be presented by a child who may harm himself or others by running away repeatedly. Their suggestions with respect to appropriate additional provisions are invited.)

3.13 Physical restraints shall be employed only when absolutely necessary to protect the child from injury to himself or to prevent injury to others. Restraints shall not be employed as punishment, for the convenience of staff, or as a substitute for a treatment program. A child shall be restrained only if alternative techniques have failed and only if such restraint imposes the least possible restriction consistent with its purpose; and then only in accordance with the following standards:

3.131 An order for restraint shall be in writing and shall not be in force for longer than 12 hours.

3.132 Except in an emergency situation, only qualified professionals may authorize the use of restraints.

3.133 A child placed in restraint shall be checked at least every 30 minutes by staff trained in the use of restraints, and a record of such checks shall be kept.

3.134 Mechanical restraints shall be designed and used so as not to cause physical injury to the child and so as to cause the least possible discomfort.

3.135 Opportunity for motion and exercise shall be provided for a period of not less than ten minutes during each two hours in which restraint is employed.

3.136 Daily reports shall be made to the superintendent by those qualified professionals ordering the use of restraints, summarizing all such use of restraint, the types used, the duration, and the reasons therefor.

3.137 Emergency use of restraints shall be authorized only by the superintendent of the institution, shall be limited to a period of not more than one hour and shall conform to all of the provisions set forth in subparagraphs 3.133–3.135 of this paragraph.

3.14 Corporal punishment shall not be permitted.

3.15 The institution shall prohibit mistreatment, neglect or abuse of any child in any way.

3.16 Alleged violations of these rules shall be reported immediately to the superintendent and there shall be a written record that:

3.161 Each alleged violation has been thoroughly investigated and findings stated;

3.162 The results of such investigation were reported to the superintendent within 24 hours of the report of the incident.

3.17 The following rules shall govern performance or work by children.

3.171 No child shall be required to perform work of any kind that involves the operation and maintenance of an institution, nor shall privileges or release from an institution be conditioned upon performance of any work. However,

(a) A child may be required to perform vocational training tasks, provided each task is:

(1) part of the child's individual treatment plan and has been approved as a program activity by a professional responsible for supervising the child's program,

(2) supervised by a qualified professional, and,

(3) not continued for longer than six months, unless it is specifically reinstated by the child's treatment plan;

(b) A child may be required to perform without compensation such housekeeping tasks as would be performed by a child in a natural home, foster home or group home, provided that nothing in the child's individual treatment plan forbids such work. In no case, however, may a child be required to perform housekeeping tasks for more than twelve other people.

3.172 A child may voluntarily engage in work during non-program hours, provided that:

(a) the child's individual treatment plan does not forbid it;

(b) the particular work has been approved by the qualified professional responsible for supervising the implementation of the child treatment plan;

(c) the particular work is supervised by qualified staff, and

(d) the conditions of employment and the compensation are in full compliance with all applicable federal laws.

3.173 No child shall be involved in the care, feeding, clothing, training or supervision of other children unless the qualified professional responsible for supervising the implementation of the child's treatment plan certifies in writing in the child's record that the particular task will not in any way endanger the life or health or be detrimental to the development of the particular children who receive such care or of the child providing it.

## IV. CONTRACTS WITH INSTITUTIONS

4.1 LHHRA shall immediately revise all contracts between LHHRA and any institution in Texas that cares for Louisiana children to require such institutions to comply with the terms of this order.

4.2 LHHRA shall terminate all contracts and refrain from entering into future contracts with any residential facility or day program that fails to provide services to

black children at a rate comparable to the rate that LHHRA attempts to place black children in that facility or program. LHHRA shall submit a written report to the Court and counsel for plaintiffs and plaintiff-intervenor on the first of February and the first of August setting forth:

4.21 the number of children by race whom LHHRA has attempted to place in each residential facility and day program;

4.22 the number of children by race who have been placed in each residential facility or day program; and

4.23 the name of each residential facility or day program with which LHHRA has terminated contracts or refused to enter into future contracts pursuant to this paragraph.

## V. MISCELLANEOUS

5.1 A written copy of all these standards shall be given the parents or tutor of each child promptly; in the future a copy shall be given the parents or tutor upon entry into an LHHRA program.

5.2 The superintendent of any institution treating a child shall report in writing to the parents or tutor of each child at least every six months on the child's educational, vocational and living skills progress and medical condition. The report shall also describe any part of the treatment that has not been afforded to the child because of inadequate resources or for any other reason.

5.3 A program of transitional treatment assistance shall be provided each child discharged to the community.

5.4 LHHRA shall assign immediately to each child at least one LHHRA case worker who shall visit that child as often as required by the child's individual treatment plan. LLHRA shall prepare a written report on each such visit and send a copy of the report to each child's parents or foster parents. This report shall describe in detail the child's health and well-being, his progress in regard to the specific goals set forth in his treatment plan, and any respect in which his treatment plan is not being implemented.

The parties may submit proposals for additions to, deletions from, or changes in this proposed order.

5.5 The terms of these standards shall cease to apply to a child only upon:

(a) the child's successful completion of all treatment as determined by the LSU evaluation team or a status-review team, pursuant to sections 2.1 and 2.4, supra, respectively;

(b) the child's release from LHHRA care or custody solely as a consequence of his having attained the statutorily established age at which participation in the DFS, EDA or any successor programs must terminate (except that in this circumstance section 6.3 shall continue to apply); or

(c) the child is returned to the care or custody of his parents or legal guardian; or

(d) the child is removed from an out-of-state institution to an institution meeting the requirements of the child's treatment plan, either public or private, in the state of Louisiana.