**David DILMORE, as the Representative of Ernest Dilmore, deceased, Plaintiff-Appellant,**

v.

**James C. STUBBS et al., Defendants-Appellees.**

No. 78–3823.

United States Court of Appeals, Fifth Circuit. Unit A

Feb. 9, 1981.

---

Stella L. Terrell, Miss. Mental Health Project, Jackson, Miss., Neal Dudovitz, Los Angeles, Cal., for plaintiff-appellant.

James P. Brantley, Dept. Atty., Whitfield, Miss., Wise, Carter, Child, Steen & Caraway, J. Leray McNamara, Jimmie B. Reynolds, Jackson, Miss., for Bell and Pace.

Before THORNBERRY, RANDALL and TATE, Circuit Judges.

THORNBERRY, Circuit Judge:

Ernest Dilmore filed this civil rights action under 42 U.S.C. § 1983, seeking redress for damages that he allegedly suffered as a result of his confinement from March 17, 1977, through April 3, 1977, in the Mississippi State Hospital at Whitfield. Dilmore sought money damages and declaratory and injunctive relief against four defendants, all employed by the State of Mississippi at Whitfield. The defendants included the Administrative Director, the Chief of the Medical Staff, the Chief of Male Psychiatric Services, as well as the Staff Physician responsible for Dilmore during his confinement.

Dilmore had a history of mental illness and had been a patient at Whitfield from 1961 to 1973. In 1973, he was discharged and released into the custody of his son and next friend in this action, David Dilmore. He resided with David until March 1977, during which time he received any necessary treatment or medication from the staff at the Jackson Mental Health Center. When his condition began to deteriorate, Dilmore followed the recommendations of physicians at the Mental Health Center and signed himself into Whitfield on March 17, 1977.

In accordance with a specific and undisputed Whitfield policy, all newly admitted patients are automatically placed in Ward 1 of the Male Receiving Building for a period of observation and treatment. Ward 1 is the most restrictive ward at Whitfield, and in addition to new admittees it houses patients who are transferred back to that ward by order of a physician for aggressive or violent behavior or for violation of Whitfield rules. Pursuant to this policy, Dil-

more was initially assigned to Ward 1. Three days later, Dilmore's son and family visited him, and they became concerned about his apparently worsening condition. That day, David Dilmore telephoned defendant Bell, Chief of Male Psychiatric Services, and complained about his father's environment and the effects it seemed to be having on him. The next day, Bell conferred with Dilmore's treating physician, defendant Pace, and Dilmore was transferred to Ward 2. Conditions on Ward 2 were not as severe as those on Ward 1, but they were nonetheless highly restrictive.

Dilmore's condition continued to deteriorate, and on April 3, 1977, seventeen days after he entered the hospital, his family removed him from Whitfield. Dilmore then spent ten days in St. Dominic's Hospital in Jackson, Mississippi, before being released to a nursing home.

Dilmore asserted two causes of action. First, he alleged that the defendants deprived him of his constitutional right to be held in a setting that least restricts his civil rights and liberties. Second, he contended that the conditions under which he was confined violated his constitutional right to be held in an environment free from physical harm and abuse. The case was tried before a magistrate who, at the close of plaintiff's case, granted defendants' motion for a directed verdict and dismissed Dilmore's claims with prejudice. The district court reviewed the magistrate's order and proceedings and signed an order of Final Judgment in favor of defendants.

On appeal, Dilmore contends only that the trial court erred in its decision on the first cause of action. We can assume, therefore, that however restrictive the conditions in Wards 1 and 2 may be, they do not so shock the conscience that they in and of themselves trigger eighth amendment considerations of cruel and unusual punishment. The issue before us, then, is whether defendants violated what Dilmore asserts to

be a constitutional right to be held in the environment that least restricts his civil rights and liberties. For the reasons that follow, we need not reach this issue. Because we find the defendants to be immune from liability for damages[1] under § 1983, we affirm the judgment of the court below.

### The Immunity Standard

The Supreme Court established the qualified immunity standard in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The dual test calls for both an objective and a subjective evaluation of official conduct. *See Bryan v. Jones*, 530 F.2d 1210, 1214 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976). Under the subjective part of the test, an official forfeits his immunity when he acts "with the malicious intent to cause a deprivation of constitutional rights or other injury" to plaintiff. 420 U.S. at 322, 95 S.Ct. at 1001; *Bogard v. Cook*, 586 F.2d 399 (5th Cir. 1978). Appellant does not argue that defendants acted with malicious intent to harm him. Rather, appellant argues that defendants forfeited their immunity under the objective part of the *Wood v. Strickland* test in that each defendant knew or should have known that application of the policy of routinely and automatically placing new admittees into Ward 1 and the subsequent decision to transfer Dilmore to Ward 2 violated Dilmore's right to be held in the least restrictive environment.

Under the objective standard, even an official who acts in the sincere subjective belief that his actions are proper will lose his qualified immunity if those actions contravene "settled, indisputable law." 420 U.S. at 321, 95 S.Ct. at 1000. *See Schiff v. Williams*, 519 F.2d 257, 261 (5th Cir. 1975). An official is thus liable under § 1983 "if he knew or reasonably should have known that the action he took within the sphere of official responsibility would violate the con-

---

1. Ernest Dilmore died on September 22, 1979, while this appeal was pending, thus mooting his claims for declaratory and injunctive relief. Dilmore's son and next friend in this action, David, filed and was granted a motion under Fed.R.App.P. 43 to be substituted as a named party.

stitutional rights" of the person affected. 420 U.S. at 322, 95 S.Ct. at 1001; *Bogard,* 586 F.2d at 411. But "[t]he fulcrum for this objective first half of *Wood* is the existence, at the time of the official's action, of clearly established judicial decisions that make his action unconstitutional." *Bogard,* 586 F.2d at 411. We do not expect an official to predict the future course of constitutional law, *id.; see also Wood,* 420 U.S. at 322, 95 S.Ct. at 1001; *O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 2495, 45 L.Ed.2d 396 (1975); but "he will not be shielded from liability if he acts 'with such disregard of the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.'" *Procunier v. Navarette,* 434 U.S. 55, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978), *quoting Wood,* 420 U.S. at 322, 95 S.Ct. at 1001.

### The Whitfield Policy

■ For the reasons that follow, we think that the constitutionality of the Whitfield admissions policy remains an open question. The unconstitutionality of that policy is anything but "clearly established." We therefore avoid the difficult constitutional decision and hold as a matter of law that defendants could not have known that their policy of temporarily placing new admittees into Ward 1 for observation and treatment would give rise to a constitutional violation. Defendants are thus entitled to a qualified immunity, and cannot be held liable for any damages that Dilmore allegedly suffered as a result of that policy.

*See Navarette, supra,* 434 U.S. at 565, 98 S.Ct. at 861. Because we premise our decision on our analysis of the state of the law, any errors that the trial court committed in its evidentiary rulings were harmless.[2]

The Supreme Court in *Shelton v. Tucker* set forth a standard applicable to all governmental restrictions on fundamental personal liberties:

> [E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in light of less drastic means for achieving the same basic purpose.

364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). As Dilmore suggests, a number of federal courts have discussed or applied this least restrictive alternative principle in evaluating government treatment of mental patients both within and without state hospitals. *See, e. g., Covington v. Harris,* 419 F.2d 617 (D.C. Cir. 1969); *Lake v. Cameron,* 364 F.2d 657 (D.C. Cir. 1966); *Gary W. v. Louisiana,* 437 F.Supp. 1209 (E.D.La.1976); *Eubanks v. Clarke,* 434 F.Supp. 1022 (E.D.Pa.1977); *Lynch v. Baxley,* 386 F.Supp. 378 (M.D.Ala.1974); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D. Wisc.1972), *vacated and remanded on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975); *Wyatt v. Stickney,* 344 F.Supp. 373 (1972), *aff'd sub nom. Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974).[3]

---

**2.** Although we need not decide the issue, we think it was probably error for the trial court to exclude the testimony of Dilmore's expert witness on the basis that defendants were unduly surprised by his testimony. The rules of discovery are designed to narrow and clarify the issues and give the parties mutual knowledge of all relevant facts, thereby preventing surprise. Although defendants did not receive the name of Dilmore's expert until three weeks prior to trial, they were well aware of the issues in the case, and Dilmore's proffer of Dr. Esser's testimony presented no new issues for defendants to meet. We do not think that Dilmore was engaging in the sort of "trial by ambush" that the discovery rules are meant to prevent. *See Shelak v. White Motor Co.,* 581 F.2d 1155, 1159 (5th Cir. 1978).

**3.** The court in *Covington* found the principle of least restrictive alternative applicable to alternate dispositions within a mental hospital. Although based on statutory grounds, *Covington* nonetheless had constitutional overtones suggesting that the absence of such a statutory right would amount to a deprivation of due process. 419 F.2d at 623. In *Covington,* the pertinent question under the appropriate standard of judicial review was "not whether the hospital has made the best decision, but only whether 'it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion.'"

If there is one common thread running through these cases, it is that the right to be held in the least restrictive environment, whatever its scope, requires individualized treatment. As Judge Rubin stated, "What is required is that the state give thoughtful consideration to the needs of the individual, treating him constructively and in accordance with his own situation...." *Gary W.*, 437 F.Supp. at 1217. We do not think the Whitfield admissions policy, which provides for a short period of observation under maximum supervision and highly restrictive conditions, is inconsistent with this requirement. A responsible physician surely needs some time to observe a newly admitted patient, about whom he may know very little, in order to intelligently evaluate that patient and develop an appropriate treatment plan. Until the physician can make that evaluation, it seems reasonable if not entirely logical to hold a new admittee temporarily in an environment that may on reflection turn out to be more restrictive than that environment ultimately determined to be proper, rather than to risk injury by placing the patient in an environment insufficient to prevent him from harming himself or others. The Whitfield admissions policy is, we think, well within the broad discretion we necessarily afford the physicians and administrators at state mental hospitals.

Dilmore also argues that the decision to transfer him to Ward 2 was made without regard to his right to the least restrictive environment. It may very well be that Dilmore was transferred only because David expressed concern about his father's condition. Nonetheless, the transfer to Ward 2 is consistent with the policy of providing for a short period of observation under highly restrictive conditions. We note that there is no evidence that defendants had made an ultimate decision to confine Dilmore for a substantial period in either Ward 1 or Ward 2, or that defendants were not actually in the process of observing and evaluating his condition. Dilmore argued that in his situation there

---

*Id.* at 621, *quoting Tribby v. Cameron*, 379 F.2d 104 (D.C. Cir. 1967). Professionally, a doctor owes even a voluntary patient a careful canvass of alternatives to drastic treatment. *Id.* at 625.

In *Eubanks*, the court relied in part on *Covington* to hold that where a state has available facilities that differ significantly in the amount of restrictions on the rights and liberties of patients, due process requires that the state place individuals in the least restrictive setting consistent with legitimate safety, care and treatment objectives. 434 F.Supp. at 1028. In *Lynch*, the trial court held that the state, in a civil commitment proceeding, has the burden of demonstrating that the proposed commitment is to the least restrictive environment consistent with the need of the person committed. The court went so far as to hold that the state must prove what alternatives are available, what alternatives were investigated, and why the investigated alternatives were not deemed suitable. 386 F.Supp. at 393. In this circuit, Judge Rubin gave considerable thought to the principle of least restrictive environment in *Gary W. v. Louisiana*, concluding that

> when the state chooses, for the most humane motives, to offer or require institutional confinement of a person, it must consider means that are capable of achieving its purposes in ways that are least stifling to personal liberty....

.... What is required is that the state give thoughtful consideration to the needs of the individual, treating him constructively and in accordance with his own situation....

437 F.Supp. at 1217.

Dilmore also cited *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. 1295 (E.D.Pa.1977), *aff'd in part and rev'd and remanded in part*, 612 F.2d 84 (3rd Cir. 1979) (en banc), *cert. granted*, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980), in support of his position. In *Halderman*, persons confined at schools and hospitals for the mentally retarded brought an action challenging their conditions of confinement. In deciding in favor of plaintiffs, the trial court relied in part on constitutional grounds, concluding that when a state admits retarded individuals into its facilities, those individuals have a constitutional right to be provided with minimally adequate habilitation under the least restrictive conditions consistent with the purpose of commitment. The Third Circuit acknowledged the "substantial case law support for the trial court's constitutional position," but avoided consideration of the constitutional issues by resolving the controversy on federal statutory grounds. 612 F.2d at 104. Dilmore thought it significant that the Third Circuit did not reject the trial court's constitutional analysis. The Supreme Court granted certiorari on questions of statutory interpretation not at issue here. *See* 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853.

was no need for an extensive observation period because defendants had access to records of his prior stay at Whitfield as well as information from the Jackson Mental Health Center. But the very fact that Dilmore was seeking readmission suggests that his condition must have changed substantially since his release four years earlier. We therefore are not prepared to say that access to this sort of record information can obviate the need for a short period of actual observation.

In any event, the unconstitutionality of the Whitfield policy is anything but settled and indisputable. We are inclined to agree with appellees that only after they have had ample opportunity to observe, evaluate, and diagnose a patient should they assume the burden of exploring least restrictive alternatives. But we need not decide the issue, for we think that at this juncture the question is sufficiently close to allow us to hold, as a matter of law, that defendants could not reasonably have known that their actions would give rise to a constitutional violation. Defendants therefore are immune from liability under § 1983 for any damages that Dilmore allegedly suffered as a result of the Whitfield policy.

AFFIRMED.